**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DALE AND KIM NEIDENBACH, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:  4:13-cv-1604-CAS |
| | ) | |
| AMICA MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DEFENDANT AMICA MUTUAL INSURANCE COMPANY'S  REPLY TO PLAINTIFFS' RESPONSES AND OBJECTIONS TO ITS STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' SINGLE ADDITIONAL FACT**</u>

COMES NOW Defendant, Amica Mutual Insurance Company ("Amica"), by and through its undersigned counsel, and for its Reply to Plaintiffs' Responses and Objections to its Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment and Response to Plaintiffs' Single Additional Fact, states as follows:

1.      At all times material hereto, Dale and Kim Neidenbach (the "Neidenbachs") were residents of Franklin County, in the State of Missouri. (*See* Doc No. 18, Plaintiffs' First Amended Complaint, ¶1; Doc No. 3, Plaintiff's Original Petition, ¶1, attached as Exhibit Q).

**ADMITTED**

2.      Defendant Amica Mutual Insurance Company is a foreign insurance company. (*See* Doc No. 18, ¶2)

**ADMITTED**

3.      Dale and Kim Neidenbach were named insureds on a homeowners insurance policy issued by Amica, Policy number 630524-20HX  ("the Policy"), with effective dates May

8, 2012 through May 8, 2013.  (*See* Doc. No. 18, ¶4; the Policy, Doc. No. 19, Attachment 1; Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶2, attached as Exhibits A and B).

       **ADMITTED**

4.     On October 10, 2012, a fire occurred at the Neidenbachs' residence, located at 991 Decker Road, Labadie, Missouri 63055. (*See* Doc. No. 18, ¶3; Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶4, attached as Exhibits A and B).

       **ADMITTED**

5.     Just hours after the fire department had extinguished the first fire, another fire occurred at the Neidenbachs' house. (*See*, both Fire Department reports, attached as Exhibits C and D; photographs taken by the Fire Department after the first fire, attached as Exhibit E; and photographs taken by the Fire Department after the second fire, attached as Exhibit F).

       **OBJECTION AND DENIED.  Plaintiffs note these are hearsay documents that have not been properly authenticated, and contain opinions by individuals not identified as opinion witnesses in this case.  Moreover, the first fire was not extinguished, clearly, as a second fire occurred, as was specifically contemplated in Exhibit C, page 3: "Homeowner was advised to call 911 if he smelt anything during the night or if the smoke alarms sounded."**

       ***REPLY:  Fire Reports with attached photographs fall within the Hearsay Exception for Public Records and Reports, according to Rule 803(8) FRE, thus, Plaintiffs' hearsay objection is without merit.  Additionally, Plaintiffs' interpretation and citation to a single sentence from the First Fire Report (Amica's MSJ Exhibit C) is insufficient to suggest that the fire department did not believe the first fire was extinguished; clearly, if the fire department***

*did not believe the fire was extinguished, they would not have left the scene.  Plaintiffs may*

*not rest on mere denials and a mere suggestion that a metaphysical dispute of fact might exist*

*will not defeat a well-supported Motion for Summary Judgment. Fed. R. Civ. P. 56(e).  Thus,*

*Plaintiffs' failed attempt to controvert Amica's Fact No. 5 should be wholly ignored.*

6.      After the second fire, portions of the structure remained standing.  (*See* Exhibit F;
5/6/2013 EUO testimony of J.D. McKeehan at page 81:17 – 83:4, attached as Exhibit G;
Affidavit of Mr. Papish, with attachments, marked Exhibit V).

**DENIED.  First, that is not what JD McKeehan's EUO testimony stated:  he only**
**discussed whether or not floors collapsed.  Second, as is apparent from the photos in**
**Exhibit F (which contains a mixture of photos after the first and second fire), after the**
**second fire, there was no side of the house where the walls maintained their integrity.**
**While there are bits of wall that remained, all the walls, as evidenced by Exhibit F, were**
**significantly consumed by fire.**

*REPLY:  The above-cited portion of the Examination Under Oath of J.D. McKeehan*
*indicates that Mr. McKeehan was able to walk down the hall and inspect his bedroom and his*
*parents' bedroom following the second fire.  Although he acknowledged the presence of water*
*and smoke damage, he testified that the walls remained standing.  Mr. McKeehan's testimony*
*is consistent with the Affidavit of Mr. Lindemann, which also recognizes that there were*
*standing portions of the dwelling when he was retained to push those portions of the building*
*into the basement cavity. (Exhibit Y).  Furthermore, the photographs contained in Exhibit F*
*were taken by the fire department <u>following the second fire</u>; there are NO photographs taken*
*after the first fire mingled within Exhibit F.   A cursory review of the photographs contained*
*in Exhibit E, those taken by the fire department after the first fire, demonstrates that the first*

3

*fire primarily damaged only the garage, the roof and the garage-accessible entryway into the house.  Comparing Exhibit E and Exhibit F puts to rest any argument that the photographs were mixed.  There is simply no basis for Plaintiffs' contention that all walls suffered significant fire damage in the second fire and Plaintiffs point to no such evidence.  Plaintiffs may not rest on mere denials and a mere suggestion that a metaphysical dispute of fact might exist will not defeat a well-supported Motion for Summary Judgment. Fed. R. Civ. P. 56(e).  Thus, Plaintiffs' failed attempt to controvert Amica's Fact No. 6 should be wholly ignored.*

7.     The Neidenbachs claimed the October 10, 2012 fire caused damage to the their dwelling, located at 991 Decker Road, Labadie, Missouri 63055, and to the personal property contained therein. (*See* Doc. No. 18, ¶3; Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶5, attached as Exhibits A and B).

**ADMITTED**

8.     The Neidenbachs purchased the house located at 991 Decker Road, in Labadie, Missouri, for $286,000 on December 13, 2006. (*See* Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶7, attached as Exhibits A and B).

**ADMITTED**

9.     Following the 2012 fire loss, the Neidenbachs filed a sworn statement in proof of loss claiming their dwelling and garage suffered a total loss, seeking $375,000.00 in alleged damage to the dwelling and garage. (*See* Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶10, attached as Exhibits A and B).

**ADMITTED, as this was the limits of the policy and the dwelling was a total loss. See Exhibit A to Defendant's Answer.**

4

10.    In signing and filing their 2011 Chapter 13 Bankruptcy Petition, Case No. 11-46383-399 in the United States District Court for the Eastern District of Missouri, Eastern Division, the Neidenbachs attested the value of their house was $300,000 and further declared under penalty of perjury that they jointly owned only $7,000 worth of household goods, furnishings, clothing, furs, jewelry, firearms, other hobby equipment, and other such personal property contents items. (*See* Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶8, attached as Exhibits A and B).

**DENIED.  While this is certainly what is filed, the insurance company attempts to use this method to value property in the same way as in an insurance loss.  As discussed in the affidavits, the Neidenbachs were advised that in bankruptcy, they were to list values as "garage sale value" – in other words, what a willing buyer would pay.  For an insurance loss, the standard is different – "fair market value" – in other words, what a willing buyer would pay AND what a willing seller would sell it for.  See Neidenbach affidavits, Exhibits 1 and 2, paragraph 2, and Pontello deposition, Exhibit 3, pp. 27-28.**

*REPLY:  Plaintiffs already ADMITTED this statement of fact on December 11, 2013, in their Responses to Amica's Requests for Admissions.  (See Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶8, Amica's MSJ Exhibits A and B). Plaintiffs cannot now erase that binding admission a year later and their attempt to controvert this statement of fact by disclaiming their prior admission should be entirely ignored.*

11.    Following the 2012 fire loss, the Neidenbachs submitted a sworn statement in proof of loss seeking $262,500 for fire damaged personal property contents items, such as household goods, furnishings, clothing, furs, jewelry, firearms and other hobby equipment. (*See*

Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶9, attached as Exhibits A and B).

**ADMITTED, again, because that was the limits of the policy and the personal property was a total loss.  See Defendant's answer, Exhibit A.**

12.     Amica advanced Dale and Kim Neidenbach $10,000 for emergency expenses and $6,350 for debris removal. (*See* Correspondence concerning Amica's advances, attached as Exhibit H and Exhibit I).

**OBJECTION.   This is not properly authenticated; it is just a letter from the Defendant, and is hearsay.**

*REPLY:  Amica's MSJ Exhibits H and I do not constitute hearsay as they are business records maintained by Amica during the normal course of business. Additionally, Plaintiffs admitted receiving funds from Amica during their Examinations Under Oath and the first claims note on the Neidenbachs' Exhibit 7 further documents the payment for debris removal. (Amica's MSJ Exhibit L Pg. 98, line 11; Neidenbach's Exhibit 8, pg. 99, lines 10 and 16). Thus, Plaintiffs' failed attempt to controvert this fact should be wholly ignored.*

13.     Amica further advanced $1,072.93 for the initial board-up of the dwelling, and hotel expenses of $3,650 per month for 11 months to secure fully furnished temporary living space, for the benefit of Dale and Kim Neidenbach, by reason of Plaintiffs' claim related to the 2012 fire. (*See* Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶12, attached as Exhibits A and B).

**ADMITTED**

14.     In signing their 2011 Chapter 13 Bankruptcy Petition, Case no. 11-46383-399 in the United States District Bankruptcy Court for the Eastern District of Missouri, Eastern

Division, the Neidenbachs declared under penalty of perjury that the couples' monthly income was approximately $4,775.64. (*See* Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶13, attached as Exhibits A and B).

**ADMITTED**

15.    The Neidenbachs retained and consulted with Mr. Pontello, their prior Bankruptcy counsel, concerning the preparation of their Bankruptcy filings and the requirement that the couple certify the accuracy of the contents; Mr. Pontello advised them to disclose every asset they had in their Bankruptcy filings. (*See* excerpt from the September 19, 2014 Deposition of Mr. Pontello, attached as Exhibit J, pg. 7:10-13; pgs. 7:22-8:2; pgs. 8:19-9:2; pgs. 9:23-10:15; pg. 11:10-23; pg. 16:6-13; pgs. 19:23-20:3; pg. 20:11-14; pg. 21:13-17; pgs. 22:24-23:13; pg. 52:11-22; and pg. 53:2-14).

**ADMITTED**

16.    The Neidenbachs did not accumulate over $255,500 worth of household contents in the year between the 2011 filing of the couples' Bankruptcy Petition and the 2012 fire and they offered no explanation for the serious discrepancy between the values listed on the Bankruptcy filings as compared to their Sworn Statement in Proof of Loss. (*See* Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶15, attached as Exhibits A and B; Exhibit K, 3/16/2013 EUO testimony of Dale Neidenbach, at pgs. 84-86; Exhibit L, 3/16/2013 EUO testimony of Kim Neidenbach, at pgs. 79-84 and 117-119).

**DENIED.  As explained above, the values are calculated differently.  In the EUOs, the Neidenbachs were never asked to explain the supposed "discrepancy."  In fact, on pp. 86-88 of Mr. Neidenbachs EUO, Exhibit K, Mr. Neidenbach tried to explain that, but was cut off.**

*REPLY:  Plaintiffs already ADMITTED this statement of fact on December 11, 2013, in their Responses to Amica's Requests for Admissions.  (See Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶15, Amica's MSJ Exhibits A and B). Plaintiffs cannot now erase that binding admission a year later and their attempt to controvert this statement of fact by disclaiming their prior admission should be entirely ignored.*

17.    During the Examinations Under Oath of Dale and Kim Neidenbach, each denied removing any personal property items from the house, other than a bag containing dog food, an urn containing a late pet's ashes, a few blankets and their dogs, both claiming that all content items were destroyed in the fire.  (*See* Exhibit K, 3/16/2013 EUO testimony of Dale Neidenbach, at pgs. 54-55 and 62-63; Exhibit L, 3/16/2013 EUO testimony of Kim Neidenbach, at pgs. 46-48).

**DENIED, in that a correction was filed to both EUOs.  Exhibits M and N.  See response to fact 18.  As the Neidenbachs indicated in that correction sheet, they interpreted the question differently than the insurance company.**

*REPLY:  Plaintiffs do not respond to the actual statement contained in paragraph 17, the content of which is entirely supported by the citations set forth above.  Plaintiffs' blanket denial and reliance on a metaphysical suggestion that a given fact may be controverted does not properly contest a properly supported Motion for Summary Judgment Fed. R. Civ. P. 56(e).  Thus, Plaintiffs' failed attempt at controverting this statement of fact should be entirely ignored.*

18.    About a month after they testified to the contrary in their Examinations Under Oath, Amica learned the Neidenbachs had concealed the existence of a rented storage unit where the couple stored personal property items removed from the dwelling following the fire loss. (*See*

8

the Neidenbachs' errata sheets revealing the existence of a storage unit, attached as Exhibits M and N).

**DENIED.   Amica "learned" this because Plaintiffs told them.   Nothing was concealed.  As indicated in the errata sheets, they interpreted the questions differently from Amica.  Any confusion was cleared up by the correction sheets, Exhibits M and N.**

*REPLY:  Plaintiffs do not respond to the actual statement contained in paragraph 18 and Plaintiffs actually ADMITTED the substance of this paragraph in their response to Paragraph 17, above.   Paragraph 18 is entirely supported by the citations set forth above. Plaintiffs may not rest on mere denials and a mere suggestion that a metaphysical dispute of fact might exist will not defeat a well-supported Motion for Summary Judgment. Fed. R. Civ. P. 56(e).   Thus, Plaintiffs' failed attempt at controverting this statement of fact should be entirely ignored.   Regarding Plaintiffs' suggestion that their subsequent change in story somehow cured their misrepresentations and concealment, the Plaintiffs' misrepresentations misdirected Amica's investigation and caused Amica to focus on the veracity of their statements and unnecessarily expand its investigation to determine what information was correct and reliable—it is inconsequential for purposes of determining the materiality of their misrepresentations that the truth was subsequently discovered.  Brawner v. Allstate, 2008 WL 3945593 (8th Cir.).*

19.    During his Examination Under Oath, Dale Neidenbach denied that they had been in arrears in making their mortgage payments. (*See* Exhibit K, at pg. 26).

**DENIED.  That is just not what Mr. Neidenbach said.  In fact, on pp. 26-28, he explained the issue with the payments – that they had basically made the mortgage payments that they understood were correct, but unbeknownst to them the payments had**

doubled, and were seeking help from a lawyer to get those modified.  Hence, the filing of

the Chapter 13.  There was no concealment of what occurred here.  Mr. Neidenbach in that

testimony never "denied that they had been in arrears in making their mortgage

payments."

*REPLY: During Dale Neidenbach's Examination Under Oath, when asked if he was*

*current on his mortgage at the time of the fire, Mr. Neidenbach said, "Basically, other than*

*the fact that, at the time of the fire, we were looking for a modification and we had been for*

*approximately 24 months and we were—I was affiliated with a lawyer at that time." (Exhibit*

*K, page 26, lines 20-24).  The Neidenbachs fail to designate any portion of the Examination*

*Under Oath where that answer changes.  On the pages cited by Plaintiffs, (Exhibit K pages,*

*26-28) Mr. Neidenbach testified about his attempts to secure a mortgage modification to*

*extinguish a variable interest rate and how this prompted his Bankruptcy filing.  However, Mr.*

*Neidenbach never stated that he was behind on his mortgage at the time of the fire. Id.  As*

*Plaintiffs have failed to cite to evidence that disputes this Statement of Fact, Plaintiffs' failed*

*attempt at controverting this statement should be entirely ignored.*

20.    At the time they filed their Bankruptcy Petition, Dale and Kim Neidenbach were

$23,100 in arrears on their mortgage; after they filed their Bankruptcy Petition, Dale and Kim

Neidenbach failed to make their required monthly mortgage payments and, therefore, continued

to get further behind on their mortgage; consequently, as of the 2012 fire, Dale and Kim

Neidenbach were in substantial arrears on their mortgage. (*See* excerpt from the September 19,

2014 Deposition of Mr. Pontello, attached as Exhibit J, pgs. 31:13-32:3; pgs. 33:14-34:3;

Deutsche Bank National Trust Company's Motion for Relief from the Automatic Stay attached

as Exhibit O).

**DENIED.  While the Plaintiffs do not deny that there were issues with the mortgage that they were attempting to resolve, Exhibit O indicates the amount owed was only $10,746.69.**

*REPLY: After having denied this point for years, the Neidenbachs now appear to ADMIT that they were **at least** $10,746.69 behind on their mortgage payments when the loss occurred.  Because Plaintiffs have failed to cite to evidence disputing the well-supported fact that the couple was in arrears on their mortgage payments at the time of the fire, their above-stated blanket denial should be entirely ignored.*

21.     Just weeks before the fire, the Bankruptcy Court granted the Bank's Motion to Lift Stay, permitting the Bank to foreclose on the Neidenbachs' house due to the Neidenbachs' failure to make monthly house payments after filing their Bankruptcy Petition. (*See* excerpt from the September 19, 2014 Deposition to Mr. Pontello, attached as Exhibit J, pgs. 36:10-37:15; pg. 39:17-40:1; and pg. 40:6-18; the Order lifting the Bankruptcy Stay, as to the Mortgage Company, attached as Exhibit P).

**ADMITTED**

22.     During their Examinations Under Oath, the Neidenbachs each denied having knowledge that the Bankruptcy Stay had been lifted at any point prior to the fire.  (*See* Exhibit K at pgs. 114-115; Exhibit L at pgs. 120-121).

**DENIED.  That is just not what they said, and it is important to understand the difference between the order lifting the stay, and the actual notice of foreclosure.  For example, when Dale was asked if he has received the order from the bankruptcy court, he responded he did not know.  He was then asked, do you understand the difference between the order and the foreclosure notice, and was then asked if he had "that information."  As**

is apparent from his answers, he was responding to whether he had the foreclosure notice. Kim answered the same way.  Her answer was "we didn't get notice until a couple days after the fire occurred that they were going to sell our home."  See also Exhibit 1, paragraph 7 and Exhibit 2, paragraph 8.

This is particularly significant in that, as the insurance company is well aware, the notice of foreclosure was mailed on October 16, 2012, Exhibit 4.

*REPLY:  Plaintiffs do not respond to the substance of paragraph 22, instead they attempt to misconstrue the accurately cited testimony provided during their Examinations Under Oath to inject an issue of fact, albeit immaterial to Amica's motion. Plaintiffs may not rest on mere denials and a mere suggestion that a metaphysical dispute of fact might exist will not defeat a well-supported Motion for Summary Judgment. Fed. R. Civ. P. 56(e). This is especially true given that the couple has shown a propensity to make misrepresentations concerning this matter.*

23.     The Neidenbachs had knowledge, prior to the fire, that the Bankruptcy Court had Ordered the Stay be lifted as to the Mortgage Company since the Court sent a copy of the Order to the Neidenbachs and they communicated with their former attorney about the Order. (*See* excerpt from the September 19, 2014 Deposition to Mr. Pontello, Exhibit J, pg. 42:18-23; pg. 43:5-7; pg. 43:11-16; pg. 48:8-20; pg.49:5-16; pg. 50:3-13; pgs. 53:22-57:13; pgs. 57:19-58:6; and pg. 58:21-59:13; the Bankruptcy Court's certification of mailing concerning the Order lifting the Bankruptcy Stay, attached as Exhibit P).

**ADMITTED**

24.     Amica's investigation was underway and no coverage determination had been made at the time the Neidenbachs filed this lawsuit, in April of 2013.  (*See* Plaintiff's Original

Petition's filed stamp, attached as Exhibit Q; dated correspondence between counsel, coordinating the next installment of the Examination Under Oath of the Neidenbachs' adult son, J.D. McKeehan, attached as Exhibit R; Correspondence between counsel concerning the inspection of the personal property items contained in the Neidenbachs' previously undisclosed storage units, attached as Exhibit S).

**DENIED.  First Plaintiffs agree no determination has been made, because up until today, even after the insurance company has filed a Motion for Summary Judgment, Amica STILL asserts that no coverage decision has been made.  See Deposition of Don Nguyen, Exhibit 5, pp. 37-8.  Plaintiffs deny an investigation was ongoing, though, at the time the lawsuit was filed.  There is no showing Plaintiffs had received the 45 day letter required by Missouri regulations; it had been almost a month since Plaintiffs EUOs, with no other action being taken as far as the Plaintiffs knew.  In fact, as is apparent from Exhibits R and S, it was a month after the lawsuit was filed that Plaintiffs were aware the investigation was continuing.**

*REPLY:  The Neidenbachs have ADMITTED they prematurely filed suit against Amica, at a time when Amica's investigation was ongoing, when no coverage decision had been made, when Examinations Under Oath had not concluded, and when Amica remained unaware of the concealed storage units filled with personal property items. (Doc. No. 51, pg. 9).  In their purported denial, above, the Neidenbachs ADMIT that no coverage determination had been made before the couple filed suit. (Doc. No. 52, ¶24).  Because the Neidenbachs have failed to point to evidence sufficient to create a material factual dispute, their denial should be ignored.*

25.     Following the fire, Amica's adjuster secured an extension of the normal municipal demolition deadline to accommodate Amica's investigation and advised the Neidenbachs about the extension, asking that the Neidenbachs not disrupt the scene of the fire to provide the company with a reasonable opportunity to investigate the loss.  (*See* confirming email and letter from Amica, attached as Exhibit T).

**OBJECTION.   Defendant has attached a letter with nothing confirming its authenticity.  It is Hearsay.**

*REPLY:  Exhibit T is not hearsay, as it is a Business Record properly maintained by Amica in the normal course of business, thus, the Plaintiffs' objection is without merit. Additionally, in his Examination Under Oath, Mr. Neidenbach admits speaking to Amica and admits that he was told Amica obtained an extension of the municipal demolition deadline. (Amica's MSJ Exhibit K, pg. 64, lines 17-23).  Plaintiffs have failed to produce evidence contradicting Paragraph 25, above, and they cannot since Mr. Neidenbach ADMITTED the substance of the statement in his Examination Under Oath, therefore, Plaintiffs' response should be ignored.*

26.     During the Neidenbachs' Examinations Under Oath, each denied participating in, paying for, or requesting anyone's assistance to demolish the fire-damaged dwelling before Amica had an opportunity to fully investigate the loss. (*See* Exhibit K at pgs. 64-66; Exhibit L at pgs. 109-112).

**ADMITTED**

27.     Within a few weeks of the loss, before Amica had an opportunity to complete its investigation of the scene, Amica discovered that the dwelling had been demolished and pushed

into the lower level and that the family pool had been removed from the property. (*See* Exhibit K at pgs. 64-67).

**DENIED.  The "evidence" presented here is questions asked in an EUO, not the answers given.  How questions become evidence is unclear, and the cited passage certainly has no mention of the status of the Defendant's investigation.**

*REPLY:  In further support of Paragraph 27, Amica asks the Court to review the Affidavits of Mr. Lindemann, Mr. Twillman and Mr. Papish.  (Exhibit Y and Z; Amica's MSJ Exhibit V).  As Amica has provided ample evidentiary support for this Statement of Fact, including citation to Mr. Neidenbach's testimony at his Examination Under Oath ADMITTING the same, and Plaintiffs have offered no citations to the record to support their denial, Plaintiffs' response should be entirely ignored.*

28.     Rather than assist in preserving the property, shortly after the loss, Dale and/or Kim Neidenbach, requested and paid Joe Lindemann $600 in cash to demolish the fire-damaged dwelling, located at 991 Decker Road, Labadie, Missouri 63055, by pushing the remains of the house into the dwelling's lower level.  (*See* Affidavit of Mr. Papish, attaching the statement of Mr. Lindemann, marked as Exhibit V).

**OBJECTION AND DENIED.  This is an unsworn statement, and providing Mr. Papish's affidavit does not convert hearsay into something else.  The statement is hearsay. Moreover, Plaintiffs flat out deny this is true.  Exhibits 1 and 2, paragraph 4.**

*REPLY:  In further support of Paragraph 28, Amica asks the Court to review the Affidavits of Mr. Lindemann and Mr. Papish.  (Exhibit Y; Amica's MSJ Exhibit V).  As Amica has provided ample evidentiary support for this Statement of Fact and Plaintiffs offer only their own incredible denials, Plaintiffs' response should be entirely ignored.*

29.     During their Examinations Under Oath, both of the Neidenbachs denied participating in, paying for, or otherwise requesting the removal of the couple's in-ground fiberglass pool from the property at 991 Decker Road; Mr. Neidenbach testified that the pool remained at the insured property, claiming someone must have filled the pool in with dirt. (*See* Exhibit K at pgs. 66-67; Exhibit L at pgs. 110-112).

**DENIED.   See Exhibits M and N, where the Neidenbachs explained their interpretation of the question, and their subsequent answers, in the correction sheets.**

*REPLY:  In further support of Paragraph 29, Amica asks the Court to review the Affidavits of Mr. Lindemann and Mr. Papish.  (Exhibit Y; Amica's MSJ Exhibit V).  Amica has provided ample evidentiary support for this Statement of Fact, including citation to Mr. Neidenbach's testimony which demonstrates there could have been no misunderstanding.  In response, Plaintiffs have offered an unreasonable and incredible explanation that they misunderstood every question on this point that was asked during the course of the couples' separate Examinations Under Oath, requiring that both construed each question precisely in the same manner, despite the use of different wording and contexts. As Plaintiffs offer no credible citations to the record to support their denial, Plaintiffs' response should be entirely ignored.*

30.     Months before their Examinations Under Oath, Dale and/or Kim Neidenbach, contacted Joe Lindemann and offered payment to Mr. Lindemann if he would agree to remove the Neidenbachs' in-ground fiberglass pool from the dwelling premises, located at 991 Decker Road, Labadie, Missouri 63055, and then store the pool; Mr. Lindemann was ultimately paid $7,000 for removing and storing the pool. (*See* Affidavit of Mr. Papish, attaching the statement

of Mr. Lindemann, the moving permit concerning the pool and related paperwork, marked as Exhibit V).

**OBJECTION AND DENIED.  This is an unsworn statement, and providing Mr. Papish's affidavit does not convert hearsay into something else.  The statement is hearsay. Moreover, Plaintiffs flat out deny this is true.  Exhibits 1 and 2, paragraph 5.**

*REPLY:  In further support of Paragraph 30, Amica asks the Court to review the Affidavits of Mr. Lindemann, Mr. Twillman and Mr. Papish, which do not constitute hearsay. (Exhibits Y and Z; Amica's MSJ Exhibit V).  Amica has provided ample evidentiary support for this Statement of Fact while Plaintiffs have offered only their own blanket denials Plaintiffs' response should be entirely ignored.*

31.    After inspecting the storage units rented by the Neidenbachs, Amica discovered the Neidenbachs had submitted a contents inventory and a Sworn Statement in Proof of Loss, wherein they sought recovery for personal property content items that were not destroyed in the fire, but were instead removed from the scene and placed in storage. (*See* Affidavit of Ray Papish with attachments, marked as Exhibit V; photographs taken by the Fire Department after the first fire, attached as Exhibit E; selected photographs produced by the Neidenbachs during discovery, time-stamped approximately one year after the loss, attached as Exhibit W; the Neidenbachs' Proof of Loss with Contents List, attached as Exhibit U.)

**DENIED.  See Exhibits 1 and 2, paragraph 6.  There were no items in the storage units that were salvageable.  Moreover, the photos show no such thing.  There is nowhere any evidence identified by Defendant, and certainly not in the attached materials, that shows one undamaged item of personal property that was claimed by the Neidenbachs in their Proof of Loss.**

*REPLY:   In further support of Paragraph 31, Amica asks the Court to review the Affidavits of Mr. Lindemann and Mr. Papish.  (Exhibit Y; Amica's MSJ Exhibit V).  Amica has provided ample evidentiary support for this Statement of Fact while Plaintiffs have offered only their own denials.  To assist the Court in its review of the cited materials, Amica draws the Court's attention to a photograph of a laptop, which appears in Exhibit X, containing photographs taken by Mr. Papish at the storage unit. Next, look for the various laptops contained on the Neidenbachs' Proof of Loss with Contents List (Amica's MSJ Exhibit U). Note that the Neidenbachs claimed the laptop as an item lost in the fire, although the laptop appears in a photograph taken after the couples' Examinations Under Oath.  There are many such items which are depicted in the fire department photos, then in the photographs taken by the Neidenbachs a year after the loss, although the same items are claimed to have been lost in the fire and unsalvageable.  Amica only offered a small sample of the photographs that demonstrate the voluminous contents that were claimed as lost and subsequently photographed, each clearly NOT lost in the fire. As Plaintiffs offer no credible citations to the record to support their denial, Plaintiffs' response should be entirely ignored.*

32.     Several months after learning about the existence of the Neidenbachs' first storage unit, Amica learned the Neidenbachs actually rented a second storage unit at the same facility, although the couple had concealed the existence of the second unit when Amica's investigator visited the facility to inspect the first storage unit.   (Correspondence between counsel concerning the concealment of the second storage unit, attached as Exhibit S).

**OBJECTION AND DENIED.  Defendant bases this unsupported and unidentified emails.  It is hearsay, and nothing is sworn here to suggest Plaintiffs concealed anything.**

18

**But more importantly, Amica has accused the Neidenbachs of many things which have turned out not to be true.  This is another one.  Exhibit 2, paragraph 7.**

*REPLY:   The cited Exhibit, containing correspondence between counsel for the Neidenbachs and counsel for Amica, <u>as identified above</u>, demonstrates the timeframe when the second storage unit was discovered along with counsel's communications concerning Amica's discovery of the second unit. Additionally, the Neidenbachs' Exhibit 2 acknowledges that Mr. Papish made multiple visit to the storage facility.   The correspondence between counsel regarding this issue is far more compelling evidence when compared to another blanket denial from the Neidenbachs.*

33.     As part of its normal claim investigation, Amica requested certain financial information from the Neidenbachs, such as bank records and income tax documentation, as well as receipts related to the Neidenbachs' purchases of various personal property content items. (*See* Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶31, attached as Exhibit A and B).

**ADMITTED**

34.     The Neidenbachs did not produce all financial information requested by Amica (referenced in #33, above) claiming that such additional information had been destroyed in the fire. (*See* Dale and Kim Neidenbachs' Responses to Amica's Requests for Admissions, ¶32, attached as Exhibit A and B).

**ADMITTED**

35.     Upon inspecting the storage units that were rented by the Neidenbachs, Amica's investigator discovered that all such financial documents were not destroyed and were instead stored by the Neidenbachs, or someone on the couple's behalf, in a storage unit, following the

fire.  (*See* photographs taken by Ray Papish of the Neidenbachs' financial documents contained in their storage units, attached as Exhibit X).

**OBJECTION AND DENIED.  First there is no affidavit supporting the photos or anything about them.  But beyond that, there are a few photos of documents with no attempt to show how these documents were not produced, were asked for, or are relevant at all to this claim.  By way of example, the photos show exactly one receipt, for the pool, that was not claimed as a loss in this fire.  They show one tax return, for 2007.  As indicated by the attached letter, Exhibit 6, the request for tax returns was for 2008 forward.  See also Exhibits 1 and 2, paragraph 6.**

*REPLY:  The Neidenbachs' response wholly ignores the fact that they admitted telling Amica that all other unproduced financial documentation had been destroyed in the fire. (See Amica's MSJ Exhibits A and B, ¶31; Doc. No. 52, ¶33-¶34). The Neidenbachs argue that Amica never found any "missing documents."   To the contrary, Amica discovered the continued existence of boxes of financial documents.   The policy requires that the Neidenbachs produce the documentation requested by Amica; it is not Amica's duty to locate documents the insureds have chosen to conceal.  (See the Policy, pg. 13 of 23, Duties After Loss, C.7(a),(b)).  Furthermore, the Neidenbachs' Exhibit 6 demonstrates the comprehensive nature of Amica's document requests.  The Neidenbachs responded to the requests, stating that the majority of the documents sought were destroyed in the fire, producing only a handful of documents. (See Amica's MSJ Exhibits A and B, ¶31; Doc. No. 52, ¶33-¶34).  Because the Neidenbachs again rely upon their own denials, which are inconsistent with other admitted Statements of Fact contained herein, their response is insufficient to create a genuine issue of material fact and should be disregarded.*

36.     The Policy of insurance (*See* Doc. No. 19, Attachment 1) relevant to this loss contains the following language on pages 13 through 16 of 23, in conjunction with pages 1 through 3 of the Special Provisions - Missouri Endorsement (HO 01 24 05 11), impacts Amica's Motion for Summary Judgment.  The Policy states:

**SECTION I - CONDITIONS**

**C.  Duties After Loss**

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, or an insured seeking coverage, or a representative of either:

***

   **4.**   Protect the property from further damage…

   **5.**   Cooperate with us in the investigation of a claim;

   **6.**   Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory.

   **7**.  As often as we reasonably require:

      **a.**  Show the damaged property;
      **b.**  Provide us with records and documents we request and permit us to make copies…    (Policy, pg. 13 of 23)

***

**H.  Suit Against Us**

No action can be brought against us unless there has been full compliance with all the terms Under Section I of this policy and the action is started within 10 years after the date of loss.

(Policy, pg.15 of 23, as modified by pg.2 of Endorsement HO 01 24 05 11)

*** 

### R.  Concealment Or Fraud

We provide coverage to no **insureds** under this policy if, whether before or after a loss, an **insured** has:

1.  Intentionally concealed or misrepresented any material fact or circumstance;

2.  Engaged in fraudulent conduct; or

3.  Made false statements;

Relating to this insurance.  (Policy, pg. 16 of 23)

**DENIED.  As it turns out, these provisions have nothing to do with Defendant's Motion for Summary Judgment.**

*REPLY:  Because there is no citation to the record and Plaintiffs' response is more appropriately categorized as legal argument, this Statement of Fact should be deemed admitted.*

### ADDITIONAL FACT

1.      The Defendant was well aware the claim for the home and personal property was a limits claim under the insurance policy because the home and personal property was a total loss.  Exhibit 7; Exhibit 8, p. 97.

*DENIED.  Significant portions of the dwelling remained standing after both fires, as demonstrated by the fire department's photographs taken after the first and second fires. (Amica's MSJ Exhibits E and F).  The Neidenbachs have produced no affirmative evidence countering Amica's allegations and evidence that the dwelling and personal property items did not suffer a total loss by fire.  In fact, after first denying removing any content items from the*

*dwelling and submitting a Sworn Statement in Proof of Loss consistent with a total loss of all contents, the couple eventually admitted removing two storage units full of personal property content items from the dwelling. (Amica's MSJ Exhibit K, pg. 54-55 and 62-63; Exhibit L, pg. 46-48; Exhibit M; Exhibit N).   Additionally, as Amica has raised the defenses of fraud, misrepresentation and concealment, the Neidenbachs' claim is removed from the ambit of the valued policy statutes.*

Respectfully submitted,


/s/ Robert W. Cockerham
Robert W. Cockerham #31984MO
COCKERHAM & ASSOCIATES, L.L.C   .
Attorneys for Defendant Amica Mutual Ins. Co.
10803 Olive Blvd.
St. Louis, MO 63141
314-621-3900
314-621-3903 FAX
rcockerham@cockerhamlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of December 2014, this document was filed via this Court's Electronic Filing System for electronic service upon Plaintiffs' counsel, David C. Knieriem. Additionally, a paper working copy of this pleading has been forwarded via U.S. Mail to the Chambers of The Honorable Charles A. Shaw, United States District Court, 111 South Tenth Street, Suite 8-N, St. Louis, MO 63102.


/s/ Robert W. Cockerham